FILED

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

2013 NOV 26  P 12: 31

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

|  |  |
|---|---|
| | ) |
| | ) |
| | ) |
| | ) |
| UNITED STATES OF AMERICA | ) **FILED UNDER SEAL** |
| *ex rel. [UNDER SEAL]* | ) **PURSUANT TO** |
| | ) **31 U.S.C. §3730(b)(2)** |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) **DO NOT PLACE IN PRESS BOX** |
| | ) **DO NOT ENTER ON PACER** |
| [UNDER SEAL] et al., | ) |
| | ) |
| | ) |
| Defendants. | ) |
| | ) Case No. 1:13-cv-1453 |
| | ) |
| | ) |
| | ) |
| | ) |

FILED

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

2013 NOV 26  P 12: 29

**FILED UNDER SEAL—FILED UNDER SEAL—FILED UNDER SEAL**

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| United States of America | ) |
| | ) |
| *ex rel.*, | ) |
| | ) |
| Stephen Bishop | ) FILED UNDER SEAL PURSUANT TO |
| | ) 31 U.S.C. §3729 ET SEQ. |
| Plaintiffs, | ) |
| | ) DO NOT ENTER INTO PACER |
| | ) Case No. 1:13-CU-1453 |
| v. | ) (AJT / JFA ) |
| | ) JURY TRIAL DEMANDED |
| LEVEL 3 COMMUNICATIONS, INC., | ) |
| | ) |
| And | ) |
| | ) |
| P.V.S. Inc., | ) |
| And | ) |
| MSO Tech, Inc., | ) |
| | |
| William S. Wilson | ) |
| (in his individual capacity) | |
| Robin P. Wilson | ) |
| (in her individual capacity) | |
| | ) |
| DEFENDANTS. | ) |

**COMPLAINT**

Relator Stephen Bishop files this Complaint on behalf of the United States as well as on

his own behalf pursuant to the qui tam provisions of the federal False Claims Act (31 U.S.C.

§3729 et seq.)("FCA") and in support thereof alleges as follows.

**INTRODUCTION AND BACKGROUND**

1.  Relator Stephen Bishop ("relator" or "Bishop") brings this qui tam action to recover

treble damages, civil penalties, costs and attorney's fees for damages to the United

States.  Such damages occurred when all defendants knowingly submitted false claims

and/or records to the United States for payment, made various false statements and/or

records to conceal overpayments from the United States and/or to avoid or decrease an

obligation to repay money to the United States, and made and used various false

records and statements material to a false claim.  Defendants also conspired together to

submit false and/or fraudulent claims.

2. Relator is the original source of the information alleged herein, and has met all

   procedural requirements of 31 U.S.C. §3730(b)(2) prior to filing this Complaint.

## JURISDICTION AND VENUE

3.  This action arises under the federal False Claims Act, 31 U.S.C. §§ 3729 et seq. The court

    has jurisdiction over this action pursuant to 31 U.S.C. §§ 3732 and 28 U.S.C. § 1331.

4. Venue is proper in this district pursuant to § 3732(a) of the FCA, which provides that

   "[a]ny action under § 3730 may be brought in any judicial district in which the

   defendant or, in the case of multiple defendants, any one Defendant can be found,

   resides, transacts business, or in which any act proscribed by section §3729 occurred."

5. At all times relevant hereto, all defendants conducted substantial business in Virginia in

   this judicial district and many of the FCA violations complained of herein occurred in this

   district and in this division.  Additionally, the Level 3 defendants maintained permanent

   employees and offices in McLean, Virginia, within this judicial district.  Additionally,

   venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1)-(2).

## PARTIES

6. Relator Stephen Bishop is a resident of the state of Texas. Relator was employed by Level 3 from October of 2010 until May of 2013; among other duties, during his employment relator served as the Senior Program Manager for a sole source contract issued to Level 3 by the Department of Homeland Security ("DHS").

7. Defendant Level 3 Communications Inc. is a Delaware corporation headquartered in Colorado with offices throughout the world, including in McLean, Virginia in this district and in this division. Level 3 has numerous subsidiary corporate entities under its control, some of which may have liability for the actions complained of herein.

8. Defendant PVS, Inc. ("PVS") is a Florida corporation headquartered in Lake Butler, Florida. PVS is a woman-owned small business; individual defendant Robin P. Wilson is the President and owner of PVS and individual defendant William Wilson is the Vice-President. At all times relevant to this case, PVS was a sham corporation with no employees, payroll, assets, or offices of its own. Defendant PVS was created for one purpose – to receive work from the Level 3 defendants that was required by law to be awarded to a small, disadvantaged, woman-owned business. PVS is run out of the same address as defendant MSO Tech, and all subcontract work awarded to PVS was actually performed by employees of MSO Tech.

9. MSO Tech is a Florida corporation headquartered in Lake Butler, Florida. William S. Wilson operates both MSO Tech and PVS Inc., the other subcontractor at issue in this case. Unlike defendant PVS, MSO Tech does have employees, payroll, and assets; at all times relevant, all work supposedly performed by PVS was performed by employees of MSO Tech.

10. Individual defendant William S. Wilson is an adult male resident of the state of Florida. William S. Wilson was the owner of MSO Tech and was co-owner of PVS; until 2013, William S. Wilson was also the husband of his co-conspirator, Robin Wilson. At all times relevant, Williams S. Wilson conspired with his wife and with various officers and agents of Level 3 to receive work from Level 3 that should have been awarded to a true woman-owned, disadvantaged small business.

11. Robin Wilson is an adult female resident of the state of Florida and, until mid-2013, was the wife of individual defendant William S. Wilson. At all times relevant, Robin Wilson conspired with her former husband and with several officers and agents of Level 3 to submit false claims to the federal government by purporting to operate a shell company known as PVS.

12. William S. Wilson and Robin S. Wilson also paid substantial monetary kickbacks to several officers of Level 3, in consideration for the award of millions of dollars in government sub-contracts and in direct violation of federal law.

### ALLEGATIONS COMMON TO ALL COUNTS

13. Level 3 is one of six "Tier-1" internet service providers in the world; in other words, Level 3 and five other companies own and operate the physical infrastructure that constitutes the "spine" of the internet. Although Level 3 is one of the few tier-one internet service providers, it does at times sublet data circuits on its network to other Tier-1 providers; Level 3 also leases data circuits from other Tier-1 providers from time to time.

14. Monthly Recurring Charges ("MRCs") are one of the major sources of revenue for Level 3; Level 3 generates billions of dollars of revenue each year in the form of "MRCs." These are charges paid each month for data transmission on Level 3's infrastructure.

15. In September of 2011, Level 3 entered into a sole-source Indefinite Quantity, Indefinite Duration (IDIQ) contract with the Department of Homeland Security. The contract number was HSSA01-11-D-0134. As an IDIQ contract, work was to be awarded under specific individual task orders.

16. Under the DHS IDIQ contract, Level 3 was awarded Task Order # 1 (which was labeled HSSA01-11-J-00044 by DHS and was for Fiscal Year 2012) and Task Order # 2 (which was labeled HSSA01-12-J-0185 by DHS and was for Fiscal Year 2013).

17. The contract named relator as Level 3's key person on page 14 of the contract; relator was the Senior Program Manager for this contract.

18. The DHS contract was known informally within Level 3 as the "Terrawatt" contract; this contract followed the same Service Level Agreements (SLAs) as a publicly offered contractual vehicle through the General Services Administration (GSA) known as "Networx."

19. At all times relevant to this Complaint, defendants also participated in a separate IDIQ contract known as "WITS 3" with the Department of Defense Office of the Inspector General ("DoD OIG").

20. Level 3's work with DoD OIG under the WITS 3 contract included including a solicitation known as WTOC06RCN0001.

### COUNT ONE – VIOLATIONS OF 31 U.S.C. 3729(a)(1)(A) and 3729(a)(1)(G)
### FALSE CLAIMS AND INVOICES ON BOTH THE WITS 3 CONTRACT AND

## ON DHS CONTRACT # HSSA01-11-D-0134
## (AGAINST ALL DEFENDANTS)

21. All prior paragraphs are reincorporated herein by reference.

22. Over time, the value of the WITS 3 contract between Level 3 and DoD OIG had come to be worth roughly $1 million per month to Level 3.

23. In June of 2012, DoD OIG announced that it would be cancelling (or not renewing) its services with Level 3 under the WITS 3 contract; it was announced that at the start of the new fiscal year (i.e., October 1, 2012) these services would no longer be needed.

24. In late June of 2012, Level 3 Vice President Tim Donelson approached relator and told relator that he (Donelson) had found a way to "save" the WITS 3 contract with DoD OIG.

25. Donelson continued, telling relator that a "high-ranking" DoD OIG official had promised Donelson that if Level 3 gave the government official's son a job with Level 3, the government official would be able to "re-build" the business with DoD OIG in the new fiscal year.

26. Soon thereafter, relator learned that the high-ranking DoD OIG official was named Stephen D. Wilson and that he was indeed a member of the Senior Executive Service. Relator learned that Stephen Wilson's son was named Michael Wilson.

27. Relator learned this in late June and early July when Donelson told relator that relator would have to hire Michael Wilson to perform work on the DHS contract under relator's supervision; Donelson told relator that, in return, Stephen D. Wilson would "re-work" the WITS 3 contract business with DoD OIG.

28. On July 2, 2012 Tim Donelson forwarded relator a series of emails with Michael Wilson's resume attached and wrote to relator: "Here's the candidate we talked about."

29. As relator reviewed the email chain forwarded to him by Donelson on July 2, 2012, he
    could see that DoD OIG employee Stephen D. Wilson had first emailed his son's resume
    to DoD OIG employee Kekoa LumHo on June 25, 2012 at 8:47 AM; LumHo then
    forwarded the resume to Level 3 manager Ron Capallia at 9:10 AM that same day, and
    at 10:41 AM that day Capallia forwarded the email and resume to Tim Donelson.

30. When Capallia forwarded the email string containing the resume to Tim Donelson, he
    wrote the following about Michael Wilson: " Well .... His resume is a little thin but he
    has excellent references." Because the email string began with an email from DoD OIG
    Senior Executive Service member Stephen D. Wilson to DoD OIG employee Kekoa
    LumHo, it was very clear to relator what Capallia meant

31. As Michael Wilson's resume made clear, at that point, Michael Wilson was a new college
    graduate with a degree in a non-technical field whose work experience consisted
    primarily of being a cashier at Chick-Fil-A; Michael Wilson also lacked the required
    security clearance required by the DHS contract relator managed.

32. Nevertheless, Capallia and Donelson told relator to hire Michael Wilson at a salary of
    $65,000 per year; this salary was grossly above-market for a new college graduate with
    a non-technical degree, no relevant work experience and who lacked a security
    clearance; nevertheless, relator did as he was told and submitted the paperwork to
    Level 3 proposing to hire Michael Wilson at a salary of $65,000.

33. On July 12, 2012, Level 3 Manager Ron Stout sent relator an email questioning why
    Michael Wilson should be paid such a high a salary. Stout stated that the correct salary
    range for someone like Michael Wilson would be between $25,597 and a maximum of

$38,390; in other words, roughly one-half of the $65,000.00 salary relator had been ordered to pay Michael Wilson.

34. As relator went about the process of hiring Michael Wilson, Stout began to send relator even more urgent emails about the salary proposed for Michael Wilson. Specifically, on July 17, 2012 Stout sent relator an email stating: "This [i.e., the salary range proposed] isn't going to work for a new grad like Michael with an unrelated degree and no experience."

35. Stout's July 17, 2012 email provided a number of additional reasons why Michael Wilson could not be hired at that salary. Among other reasons, Stout complained that Level 3 did not have any entry-level jobs appropriate for Michael Wilson on Task Order 1 of the DHS contract. Because relator was the Senior Program manager for the DHS contract, he knew that Stout's statement was true.

36. On July 19, 2012, relator sent an email to Donelson explaining the difficulties associated with hiring Michael Wilson; on July 20, 2012, relator received a reply email from Donelson ordering relator to "contact him [i.e., Mike Wilson] today and get the process started. I will correct Stout if needed."

37. Ultimately Stout stopped protesting and Michael Wilson was hired at a salary of $65,000 per year. Michael Wilson started work for Level 3 in early August of 2012.

38. Relator had been told by Tim Donelson that the DoD OIG contract would be cancelled for a one-month period; Donelson further told relator that, as consideration for the hiring of Michael Wilson, Stephen D. Wilson would "re-work" or "re-build the contract

between DoD OIG and Level 3 in the new fiscal year (or words to that effect) and that is exactly what happened.

39. Specifically, in September of 2012 no work was performed by Level 3 on the DoD OIG contract; however, on October 2, 2012, after the start of the new fiscal year, work on the DoD OIG contract resumed; Level 3 continued to award this DoD OIG work to sub-contractor MSO Tech, and to add a percentage on top of what MSO Tech billed Level 3.

40. For example, Level 3 issued purchase order 91869 to MSO Tech in the amount of $118,000 on October 2, 2012 for work to be performed on the WITS 3 contract with DoD OIG.

41. In total, because Stephen D. Wilson "re-worked" the DoD OIG contract with Level 3 and MSO Tech, defendants were able to bill the government an additional at least an additional $1,533,306.70 during just the first six months of FY 2013; without question Level 3 and MSO Tech continued to bill the United States in this manner for work on the WITS 3 contract with DoD OIG.

42. The hiring of Michael Wilson was an indirect kickback to his father, Stephen D. Wilson; alternatively, the hiring of Michael Wilson was a bribe indirectly paid to his father.

43. Level 3 paid Michael Wilson a salary two or three times greater than the market-supported salary for an individual with his experience, education, and skills.

44. Further evidence that the hiring of Michael Wilson was a bribe or kickback is this: the contract between Level 3 and the government stated as follows: "Contractors are responsible for providing personnel with the required security clearances and accesses as DHS does not sponsor background investigations for contractor personnel."

45. Because Michael Wilson was a new college graduate with no relevant work experience, he did not have the security clearance required by the government and, as a result, Michael Wilson's work had to be performed by other employees for a number of months until his security clearance came through; in the meantime, although he was paid his full salary, Michael Wilson had very little real work to perform for Level 3.

46. In addition, the government was billed for and paid for Michael Wilson's work during these periods when there was no work he could perform.

47. When relator asked Donelson if it was legal to hire the son of a high-ranking DoD OIG official in exchange for receiving a contract extension or renewal, Donelson told him "This is how business gets done, Stephen" or words to that effect.

48. Relator did not take the payment of kickbacks and/or bribes to a high-ranking federal employee as lightly as Donelson.

49. When relator learned about this kickback or bribe, he fulfilled what he saw as his duty to the United States and reported the above-information to numerous parties both inside and outside Level 3.

50. Internally, relator reported these events to Neil Eckstein, the internal compliance officer of Level 3; externally, he reported these events to the DoD and DHS Office of the Inspector General via information relayed orally to Debra Mims, the DHS contracting officer. In his written correspondence, he specifically cited FAR 52.203-7, which prohibits kickbacks and bribes in government procurement.

51. The Federal Acquisition Regulations further provide, at FAR 52.203-13, that a Contractor "shall timely disclose, in writing, to the agency Office of the Inspector General (OIG),

with a copy to the Contracting Officer, whenever ... the Contractor has credible evidence

that a principal, employee, agent, or subcontractor of the Contractor has committed ...

a violation of Federal criminal law involving fraud, conflict of interest, bribery, or

gratuity violations found in Title 18 of the United States Code."

52. Payment or acceptance of a direct or indirect bribe, kickback, or gratuity to a

government official in return for the award of a contract or task order is unlawful

pursuant to 18 U.S.C. § 201 *et seq*. and is punishable by up to five years in prison and a

fine of not more than $10,000.00.  Moreover, it unlawful to conspire to 18 U.S.C. § 371

makes it unlawful to conspire to defraud or commit any offense against the United

States.

53. These statutory and regulatory provisions (i.e., FAR 52.203-13, 18 U.S.C. § 201 and 18

U.S.C. § 371) among other statutory and regulatory provisions, demonstrate an

important commitment by the United States to eliminating corruption in the

procurement process and prohibiting bribes and kickbacks to government officials.

54. Despite the fact that Neil Eckstein, the internal compliance officer at Level 3, learned

about these schemes, Level 3 did not fulfill the requirements of FAR 52.203-13 in that

Level 3 did not disclose these events to the government.

55. Level 3 paid an indirect kickback or bribe to government employee Stephen D. Wilson.

Wilson accepted this indirect bribe or kickback, and fulfilled his end of the bargain by re-

working a lucrative contract and ensuring that Level 3 (and, by extension, subcontractor

MSO Tech and William Wilson) received that new work.

56. The United States does not pay claims tainted by kickbacks or bribes to government
officials and claims procured through the direct or indirect payment of bribes and
kickbacks are not eligible for payment by the United States.

57. As alleged in this count, Level 3, paid indirect kickbacks and bribes to Stephen D. Wilson
and then submitted claims to the United States for payment that were only made
possible because of the kickbacks and bribes.

58. In addition, because the claims for work on the WITS 3 contract submitted in FY 2013
were only possible because of a bribe or kickback to a federal employee, defendants
received overpayments which they failed to repay to the United States.

59. As a result, the United States has been damaged in the amount of not less than
$3,066,613.40.

## COUNT TWO – VIOLATIONS OF 31 U.S.C. § 3729(a)(1)(A)
## SUBMISSION OF FALSE CLAIMS FOR MONTHLY RECURRING CHARGES FOR DATA CIRCUITS
## ON DHS CONTRACT # HSSA01-11-D-0134
## Task Order # 1 (HSSA01-11-J-00044)
## (AGAINST LEVEL 3)

60. All of the preceding paragraphs are reincorporated and realleged by reference, herein.

61. As part of Level 3's contractual responsibilities to the United States on DHS contract
HSSA01-11-D-0134, Level 3 agreed to provide two data circuits of 200Mbps each going
from a Level 3 data facility located in Herndon, Virginia, to a data facility in Clarksville,
Virginia operated on behalf of DHS by Hewlett Packard.

62. Level 3 began billing the government for these circuits at the time Task Order # 1 was
awarded, and the first invoice went out in November 2011 for the month of October

2011.  The agreed-upon price was $24,000.00 per month for each of the two circuits – in other words, a total of $48,000.00 a month.

63. However, the circuits—which were eventually leased from Mid-Atlantic broadband— were not put into service until late September or early October of 2012; the Level 3 defendants had therefore billed the United States 11 equal monthly installments for circuits that were not in fact transmitting any data.

64. Relator knows this because he worked with other Level 3 employees to prepare a document labeled "CDRL#038 – Burn In Test Report."  This contractually-required document constitutes the proof that the two circuits for which the government pays are actually transmitting data.  This document was prepared and submitted in the first week of October, 2012 because those two data circuits were not transmitting any data prior to the first week of October.

65. Relator submitted this contractually required document to DHS via an email to DHS employee Debra Mims on October 6, 2012.

66. Defendants therefore submitted at least 11 individual false claims to the government. The claims were these two circuits were false because the defendants charged the government for MRCs on data circuits that were not in fact transmitting data.

67. In total, the United States paid $528,000.00 in MRCs for these two data circuits which the United States should not have paid.

68. As a result, the United States has been damaged in the amount of $528,000.00.

**COUNT THREE – VIOLATIONS OF 31 U.S.C. § 3729(a)(1)(A)
SUBMISSION OF FALSE CLAIMS FOR MONTHLY RECURRING CHARGES FOR DATA
CIRCUITS ON DHS CONTRACT # HSSA01-11-D-0134
Task Order # 1 (HSSA01-11-J-00044) and Task Order # 2 (HSSA01-12-J-0185)**

## (AGAINST LEVEL 3)

69. All preceding allegations are reincorporated by reference herein.

70. As part of Level 3's Monthly Recurring Charges to the United States, Level 3 agreed to provide DHS a different data circuit (known in the industry as a "10GB wavelength circuit") into Level 3's Herndon Virginia data facility.

71. Level 3 began billing for this circuit in July 2012 in support of Task Order # 1 (HSSA01-11-J-00044) on DHS Contract # HSSA01-11-D-0134. At that time, the monthly recurring charge was $85,737.50; Level 3 made a total of three claims for monthly recurring charges in July, August, and September of 2012; the cost to the United States for these three months was $257,212.

72. When Task Order # 1 expired at the end of FY 2012, billing for the 10GB wavelength circuit became part of Task Order # 2 for FY 2013.

73. For FY 2013, when billing for this 10GB wavelength circuit transitioned to becoming part of Task Order #2, the price of the circuit decreased to $81,450.63 from $85,737.50.

74. Claims were made to the United States for monthly recurring charges for this 10GB circuit for the first eight months of FY 2013 – that is, every month from October of 2012 through May of 2013; those claims were for $81,450.63 every month.

75. However, relator has first-hand, non-public knowledge that this 10GB wavelength circuit was not transmitting any data in May of 2013 when he resigned his employment with Level 3; relator further knows that Level 3 officials, including Donelson, knew full and well that this circuit was not transmitting any data.

76. In fact, relator has first-hand knowledge that this 10GB wavelength was still not transmitting any data in July of 2013, because that month Scott Herman, the Deputy Program Manager, called relator on relator's personal cellphone requesting the Circuit ID for the 10GB wavelength circuit.

77. Scott Herman called relator to request the Circuit ID, because without the Circuit ID, the circuit could not be "provisioned." In other words, without the Circuit ID the circuit could not begin transmitting data.

78. Even though the 10GB wavelength circuit was not transmitting any data at all from July of 2012 through July of 2013, Level 3 knowingly submitted (or caused to be submitted) false claims to the United States for monthly recurring data charges on those circuits for each one of those months in the total amount of $1,071,718.80.

79. Those claims were false and Level 3 officials knew they were false and, as a result, the United States has been damaged in the amount of $1,071,718.80.

## COUNT FOUR – VIOLATIONS OF 13 U.S.C. § 3729(a)(1)(A) and § 3729(a)(1)(C)
### SUBMISSION OF FALSE CERTIFICATIONS OF COMPLIANCE WITH WOMAN-OWNED BUSINESS REQUIREMENTS AND CONSPIRACY TO SUBMIT FALSE CLAIMS TO THE UNITED STATES ON DHS CONTRACT # HSSA01-11-D-0134
### Task Order # 1 (HSSA01-11-J-00044) and Task Order # 2 (HSSA01-12-J-0185)
### (AGAINST ALL DEFENDANTS)

80. All preceding allegations are reincorporated by reference herein.

81. In September of 2011, when Level 3 entered into the contract with DHS, numerous provisions of the United States Code and the Federal Acquisition Regulations were incorporated and included by reference.

82. Those provisions included a mandatory set-aside that required Level 3 to award a certain amount of work to a woman-owned small business concern.

83. Under FAR 52.204-8, certain annual representations and certifications were required in this regard not only by Level 3, as the prime contractor, but also by its subcontractors, PVS and MSO Tech.

84. Rather than award work to an actual woman-owned, disadvantaged small business, Level 3 defendants entered into a conspiracy with defendants Robin Wilson, William Wilson, and the two corporate entities under their control, PVS and MSO Tech.

85. Defendant Robin Wilson was owner of the majority of the stock in PVS; she was also the wife of William Wilson, the owner of MSO Tech, one of the major sub-contractors for Level 3.

86. PVS was at all times relevant to this Complaint, a sham corporation in that PVS had no employees, payroll, or assets; despite not having any employees, payroll, or assets, PVS was awarded millions of dollars in sub-contract work.

87. At all times relevant, the work of all sub-contracts awarded to PVS was performed by employees of MSO Tech; likewise, the billing and back-office functions of PVS were performed by MSO Tech employees.

88. Relator has personal, first-hand knowledge of this because he was the Level 3 employee responsible for receiving invoices to Level 3 for work performed by supposedly performed by PVS but in reality performed by MSO Tech.

89. As just one specific example, on October 23, 2012, MSO Tech Program Manager Terri Milton sent relator an email with four invoices for services rendered; Terri Milton was at all times an employee of MSO Tech and so she sent these invoices via her MSO Tech email address.

90. The total amount of the four invoices was $1,094,716. As Milton explains in her email to relator, "These invoices need to be paid to PVS."

91. Milton further instructs relator in that email that two of the four invoices "complete the previous PO for Clarksville ... [and the other two invoices] are from the new PO."

92. By that, Milton meant that two of the four invoices were from Task Order # 1 (HSSA01-11-J-00044) and two of the invoices were from Task Order # 2 (HSSA01-12-J-0185).

93. Relator was advised by Tim Donelson to issue these new purchase orders to PVS due to PVS "incurring increased costs to complete the job [i.e., the 30 mile fiber-optic extension" and the final 2 invoices were issued to Task Order # 2 to "make PVS whole" although no supporting data was ever provided to relator to support the additional purchase orders. Only verbal direction was provided from Tim Donelson to support these orders, as well as text messages inquiring to relator about project number and the amounts of money remaining in those task orders that had not yet been billed.

94. The invoices submitted by Milton to relator were, to be sure, on PVS letterhead; however, PVS letterhead was more or less the only link between PVS and this work, because it had no employees, payroll or assets.

95. In total, more than $6,472,304.00 in sub-contract work was "awarded" to PVS as a woman-owned, disadvantaged small business. None of the work was performed by PVS, however, and all such work was performed by employees of MSO Tech, which was not a woman-owned business.

96. Despite the fact that PVS was a sham corporation with no employees and no assets, and despite the fact that all work awarded to PVS was performed by employees of MSO

Tech, the Level 3 defendants made affirmative representations to the government that they were doing a specific dollar amount of business with small, woman-owned, disadvantaged business concerns.

97. The Level 3 defendants made representations and certifications to the United States in this regard four times per year; those representations and certifications were false and Level 3 knew they were false at the time the representations were made.

98. Furthermore, Level 3 (via officers Ron Capallia and Tim Donelson) entered into a conspiracy with William Wilson and Robin Wilson (and the two companies under their control) to submit false or fraudulent claims to the United States; without the assistance and cooperation of Robin Wilson and William Wilson (and the two companies under their control) Level 3 would not have been able to complete its plan to submit false claims to the United States.

99. As a result, the United States has been damaged in an amount of not less than $6,472,304.00.

### COUNT FIVE – VIOLATIONS OF 31 U.S.C. § 3729(a)(1)(A)
### DHS CONTRACT # HSSA01-11-D-0134
### TASK ORDER #1 (HSSA01-11-J-00044)
### (AGAINST ALL DEFENDANTS)

100.   All of the preceding paragraphs are reincorporated and realleged by reference.

101.   Defendants all conspired together to submit false and fraudulent claims to the United States in the amount of $3,623,252 for construction work associated with laying more than 30 miles of fiber-optic cable; the $3.6 million was included in Level 3's monthly charges to DHS under Task Order # 1 (HSSA01-11-J-00044).

102.    Level 3 had contracted with the United States as part of DHS contract HSSA01-
        11-D-0134 to provide data service from the Level 3 data center in Herndon, Virginia, to
        the DHS data center in Clarksville, Virginia; Level 3 represented to the government that
        it would extend its own physical infrastructure into the Clarksville, Virginia data center.

103.    However, Level 3 knew at the time the plan was formed (and prior to the
        issuance of the purchase orders to subcontractor PVS) that Level 3 would not have
        access to the Clarksville data center and would not be able to extend Level 3's physical
        infrastructure into the Clarksville data center.

104.    Level 3 also knew, at all times relevant, that Mid-Atlantic Broadband operated a
        reliable fiber-optic network throughout the southeastern part of the Commonwealth;
        Level 3 further knew that Mid-Atlantic Broadband did have access agreement with the
        Clarksville data center, and Level 3 knew they would be able to lease enough broadband
        space from Mid-Atlantic Broadband to meet the needs of the DHS contract.

105.    Relator has first-hand, non-public information that Level 3 knew it would not
        have access to the Clarksville data center because, prior to the start of construction on
        the 30 miles of fiber-optic cable, relator and Tim Donelson had approached Hewlett
        Packard (which operates the Clarksville data center for DHS) to negotiate the terms of a
        building access agreement.

106.    A building access agreement is fundamental to internet service providers like
        Level 3; in basic terms, a building access agreement is a written contract in which the
        internet service provider agrees to build the physical infrastructure necessary to reach a

particular facility, and the owner of the data center agrees to use that internet service provider for a certain period of time in return.

107.     A building access agreement contains various other terms and conditions vital to internet service providers like Level 3. For example, for an internet service provider to be able to provide service to a data center like the Clarksville facility, a number of very specific technical requirements must be met by the facility, and without a written guarantee of those specific technical requirements internet service providers will not construct an expensive fiber-optic extension using their own funds. Among other technical requirements, the data facility must have sufficient wiring and electricity to power the necessary equipment, and there are also very specific temperature requirements of the data facility in order to avoid overheating. There are numerous other specific technical requirements that an internet service provider requires before building its data connection to a given facility.

108.     When Donelson and relator approached HP/DHS to negotiate the terms of the building access agreement that would guarantee these technical requirements (among other technical requirements) they were told clearly and unequivocally that the facility either did not need or could not accommodate an additional service provider and therefore that Level 3 would not be allowed to extend its physical network to the data center, either now or at any time in the future.

109.     This information was conveyed in several ways, including at a meeting in Arlington Virginia between Level 3 employees (including relator) and DHS employees.

110.      Despite being told that the Clarksville data warehouse did not need or could not accommodate another internet service provider, Level 3 represented to the United States that it would be allowed to extend the Level 3 network to the data center, and Level further represented that construction of a 30 mile extension of fiber optic cable would be necessary in order to accomplish this.

111.      Level 3, through its officers and agents, then subcontracted with PVS to construct the 30 mile extension from Henderson, North Carolina, to Clarksville, Virginia.

112.      Because Level 3 knew that the 30 mile fiber-optic extension would never be used (and again, because it knew it would never have physical access with its network equipment) Level 3 and PVS/MSO simply terminated the 30-mile fiber-optic extension on Burlington Drive in Clarksville Virginia, across the street from the data warehouse.

113.      Level 3 defendants chose PVS to serve as the subcontractor on this work; in fact, the $3.6 million for the fiber-optic cable was part of the total work awarded to sham corporation PVS, but actually performed by MSO Tech employees.

114.      Further proof of the sham-nature of PVS is that when PVS had to have an employee obtain a security clearance to work on this 30 miles of fiber-optic cable, it had an MSO Tech employee named Dean Carter cleared by the government and not a PVS employee, because PVS didn't have any employees.

115.      In addition, Level 3 counted the $3.6 million supposedly sub-contracted to PVS as part of its minority set-aside requirements; Level 3 falsely reported to the government that the work was performed by a woman-owned small company named

PVS, when in reality the work was performed by MSO Tech employees including but not limited to Dean Carter.

116.     Level 3, through Donelson and/or Capallia, made false representations to the United States by representing that it was necessary to construct a 30 mile extension of fiber-optic cable from Henderson, North Carolina, to the Clarksville, Virginia data center in order for Level 3 to be able to connect the Clarksville data center to the secure Level 3 facility in Herndon, Virginia.

117.     This representation was false because Level 3 knew at the time it made the representation that it was possible to simply sublet a quantity of two circuits provisioned for 200 Mbps from Mid-Atlantic Broadband; however, Level 3 and the other defendants wished to be able to charge the United States more than $3.6 million for the construction of the fiber-optic extension, and defendants knew that this would not have been possible if they had told the government the truth.

118.     As a result, the claims submitted to the United States for the $3.6 million paid to construct the 30 mile fiber-optic extension were false for two separate reasons – first, because all of the defendants conspired together to submit false claims to the government certifying that Level 3 had met the woman-owned business set-aside requirement of the DHS contract, and second because the 30 mile fiber-optic extension would never be used and defendants knew that it would never be used, and because Level 3 knew all along that it would actually sublet data circuits from Mid-Atlantic.

119.     As a result, the United States has been damaged in the amount of $3,623,252.00.

**COUNT SIX – VIOLATIONS OF 31 U.S.C. § 3729(a)(1)(B) and (G)
DHS CONTRACT # HSSA01-11-D-0134**

## Task Order # 1 (HSSA01-11-J-00044) and Task Order # 2 (HSSA01-12-J-0185) (AGAINST LEVEL 3)

120.     All preceding paragraphs are reincorporated and realleged by reference, herein.

121.     Although the professional services component of the DHS contract was firm fixed price, Level 3 was required to provide hourly rates to the Government as part of its pricing justification.

122.     The information provided by Level 3 was false and inflated the salaries of all employees that would perform work.  As a result Level 3 received a series of overpayments.

123.     For example, relator has first-hand knowledge that the cost for the Program Manager's position (this was the role relator performed) for Task Order #2 was represented to the government to be $205,000.00 when in reality the Program Manager's salary was $142,800.00 and his benefits package was no more than an additional $35,000 per year at most; in addition to overstating his salary, Level 3 also added on an additional percentage which was supposed to constitute its profit.

124.     Level 3 also stated incorrectly the number of employees of various types needed to perform the work of the DHS contract. As a result, more expensive technical employees often performed work unrelated to their technical fields of specialization. Also, as a result of turnover, Level 3 would routinely staff the DHS contract with four or five less Full Time Employees than were being billed to the government.

125.     The creation and use of these false records and statements resulted, overall, in a higher FFP than necessary to the United States Government; Level 3 made and used false records or statements to retain these overpayments.

126.     Among the FAR clauses incorporated by reference were 52.215-10—Price

Reduction for Defective Cost or Pricing Data

127.     This clause gives the government the right to reduce the price payable to the

contractor if the pricing data provided to the government is defective or faulty.

Importantly, the clause makes it clear, in 52.215-10(d), that if the government has

already paid money as a result of defective cost or pricing data, such payments are

"overpayments."

128.     Even if Level 3 did not intentionally start out with the intent to create and submit

false claims or records in support of knowingly false claims, Level 3 did retain the

overpayments that resulted from unintentional understaffing of the DHS contract

and/or misrepresenting the salaries and benefits paid to its employees working on the

contract and/or placing highly-compensated technical employees in non-technical roles.

129.     As a result, the United States has been damaged in an amount to be determined

at trial.

### COUNT SEVEN – VIOLATION OF THE FEDERAL FALSE CLAIMS ACT 31 U.S.C. § 3729(a)(1)(A) AND (G) (AGAINST ALL DEFENDANTS)

130.     All of the preceding paragraphs are realleged and reincorporated by reference.

131.     The Anti-Kickback Act of 1986 (41 U.S.C. §§ 51-58)("AKA") was passed to deter

subcontractors from making payments and contractors from accepting payments for the

purpose of improperly obtaining or rewarding favorable treatment in connection with a

prime contract or a subcontract relating to a prime contract.

132.     AKA also requires contractors to have in place and follow procedures designed to

prevent and detect violations of the Act in its own operations and direct business

relationships.

133.     At all times relevant to this Complaint, Level 3 officer Tim Donelson accepted

kickbacks and/or bribes from William Wilson, who owned and operated MSO Tech and

who also owned a minority share of PVS; these kickbacks and bribes were illegal

consideration for the continuing award of millions of dollars in work to MSO and PVS.

134.     Among other bribes and kickbacks, William Wilson provided expensive all-

expenses paid hunting trips to Donelson and provided Donelson will an all-expense paid

trip to the Daytona 500 in 2012.  William Wilson also purchased a new pickup truck for

Donelson in exchange for Donelson's granting the companies under Wilson's control

sub-contracts as complained of herein.

135.     The United States does not pay claims tainted by kickbacks; as such, claims for

work obtained by the payment or receipt of kickbacks are ineligible for payment.

136.     The AKA also provides that the price or cost of the kickback is presumed to have

been borne by the United States.

137.     Level 3 employee Donelson accepted kickbacks and/or gratuities and the cost of

those kickbacks or gratuities is presumed to have been borne by the government.

138.     As a result, the United States has been damaged in an amount to be determined

at trial.

WHEREFORE, Relator respectfully requests that the Court enter judgment against

DEFENDANTS LEVEL 3 COMMUNICATIONS, INC., PVS INC., MSO TECH, INC., WILLIAM S.

WILSON AND ROBIN P. WILSON, JOINTLY AND SEVERALLY, as follows: (a) That the U.S. be awarded three times the damages sustained as a result of the false claims and fraud alleged in this count in an amount to be determined at trial but not less than $45,000,000.00 (forty five million dollars); and (b) that a civil penalty of $11,000 be imposed for each and every false claim proven at trial that defendants presented to the U.S. and/or caused to be presented to the U.S.; and (c) that pre-and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses incurred by the relator in prosecuting this case; and (d) that the relator be awarded the maximum percentage of the government's recovery allowed pursuant the False Claims Act; additionally, relator requests any alternative or supplemental relief the court may deem appropriate.

TRIAL BY JURY IS DEMANDED.

Date: __11/24/2013__

For Relator Stephen Bishop:

Zachary A. Kitts
Virginia Bar # 47052
Counsel for Relator
K&G Law Group, PLLC
3554 Chain Bridge Road, Suite 400
Fairfax, Virginia 22030
Phone: 703-649-5500
Fax: 703-649-6363
Email: zkitts@kglawpllc.com