FILED

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## ALEXANDRIA DIVISION

2014 JUN 16  P 12: 46

CLERK US DIST COURT
ALEXANDRIA, VIRGINIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br>*ex rel. [UNDER SEAL]*<br>Plaintiffs,<br><br>v.<br><br>[UNDER SEAL] et al.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | FILED UNDER SEAL<br>PURSUANT TO<br>31 U.S.C. §3730(b)(2)<br>AND COURT ORDER<br><br>DO NOT PLACE IN PRESS BOX<br>DO NOT ENTER ON PACER<br><br>Case No. 1:13cv1453 (AJT/JFA) |

**UNDER SEAL COVER SHEET**

**Case No. 1:13cv1453 (AJT/JFA)**

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## ALEXANDRIA DIVISION

### FILED UNDER SEAL PURSUANT TO COURT ORDER

| | | |
|---|---|---|
| United States of America | ) | |
| *ex rel.,* | ) | |
| | ) | |
| Stephen Bishop | ) | FILED UNDER SEAL PURSUANT TO |
| | ) | 31 U.S.C. §3729 ET SEQ. AND COURT ORDER |
| PLAINTIFFS, | ) | |
| | ) | DO NOT ENTER INTO PACER |
| | ) | Case No. 1:13cv1453 (AJT/JFA) |
| v. | ) | |
| | ) | JURY TRIAL DEMANDED |
| LEVEL 3 COMMUNICATIONS, INC., | ) | |
| *et al.* | ) | |
| DEFENDANTS. | ) | |

### RELATOR'S FIRST AMENDED COMPLAINT

Relator Stephen Bishop files this Amended Complaint under seal on behalf of the United

States as well as on his own behalf pursuant to the *qui tam* provisions of the federal False

Claims Act (31 U.S.C. §3729 et seq.)("FCA") and in support thereof alleges as follows.

### INTRODUCTION AND BACKGROUND

1. Relator Stephen Bishop ("relator" or "Bishop") brings this *qui tam* action to recover

treble damages, civil penalties, costs and attorney's fees for damages to the United

States. Such damages occurred when all defendants knowingly submitted false claims

and/or records to the United States for payment, made various false statements and/or

records to conceal overpayments from the United States and/or to avoid or decrease an

obligation to repay money to the United States, and made and used various false

records and statements material to a false claim. Defendants also conspired together to submit false and/or fraudulent claims.

2. Relator's original Complaint was filed *in camera* on November 26, 2013. Relator also filed a Motion to Place the Complaint Under Seal with the Complaint. The Court granted relator's motion to seal by way of an Order entered January 3, 2014. *Doc. # 4.*

3. The United States was served as required by statute. On or about January 23, 2014, the United States filed a motion requesting an extension of the seal, to which the relator consented. The consent motion was granted shortly thereafter, and the seal is not set to expire until July 28, 2014.

4. Relator is the original source of the information alleged herein, and has met all procedural requirements of 31 U.S.C. §3730(b)(2) prior to filing this Complaint.

### JURISDICTION AND VENUE

5. This action arises under the federal False Claims Act, 31 U.S.C. §§ 3729 et seq. The court has jurisdiction over this action pursuant to 31 U.S.C. §§ 3732 and 28 U.S.C. § 1331.

6. Venue is proper in this district pursuant to § 3732(a) of the FCA. At all times relevant, all defendants conducted substantial business in Virginia in this judicial district and many of the FCA violations complained of herein occurred in this district and in this division. Ron Capallia and Tim Donelson, two high-level executives of Level 3 responsible for the planning and execution of most or all of the bad acts alleged herein, were based in McLean Virginia. Additionally, Level 3 maintained permanent employees and offices in McLean, Virginia, within this judicial district. Additionally, venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1)-(2).

**PARTIES**

7. Relator Stephen Bishop is a resident of the state of Texas. Relator was employed by
   Level 3 from October of 2010 until May of 2013. During his employment relator served
   as the Senior Program Manager for a sole source contract issued to Level 3 by the
   Department of Homeland Security ("DHS").

8. Defendant Level 3 Communications Inc. is a Delaware corporation headquartered in
   Colorado with offices throughout the world, including in McLean, Virginia in this district
   and in this division. Level 3 has numerous subsidiary corporate entities under its
   control, some of which may have liability for the actions complained of herein.

9. Defendant PVS, Inc. is a Florida corporation headquartered in Lake Butler, Florida. PVS
   is a woman-owned small business; individual defendant Robin P. Wilson is the President
   and owner of PVS and individual defendant William S. Wilson is the Vice-President. At
   all times relevant to this case, PVS was a sham corporation with no employees, payroll,
   assets, or offices of its own. Defendant PVS was created to receive set-aside work from
   Level 3.

10. MSO Tech, Inc. is a Florida corporation headquartered in Lake Butler, Florida. Unlike
    defendant PVS, MSO Tech does have employees, payroll, and assets; at all times
    relevant, all work supposedly performed by PVS was actually performed by employees
    of MSO Tech.

11. Defendant William S. Wilson is an adult male resident of the state of Florida. William S.
    Wilson is the owner of MSO Tech and was co-owner of PVS. At all times relevant,
    Williams S. Wilson conspired with Robin Wilson and with various officers and agents of

Level 3 (including but not limited to Donelson and Capallia) to submit false and/or fraudulent claims to the United States.

12. Robin Wilson is an adult female resident of the state of Florida. Robin Wilson was the majority owner of PVS. At all times relevant, Robin Wilson conspired with William Wilson and with officers and agents of Level 3 to submit false and/or fraudulent claims to the United States.

13. Until mid-2013, William Wilson and Robin Wilson were husband and wife.

### ALLEGATIONS COMMON TO ALL COUNTS

14. Level 3 is one of six "Tier-1" internet service providers in the world; in other words, Level 3 and five other companies own and operate the physical infrastructure that constitutes the "spine" of the internet.

15. Monthly Recurring Charges ("MRCs") are one of the major sources of revenue for Level 3; Level 3 generates billions of dollars of revenue each year in the form of "MRCs." These are charges paid each month for data transmission on Level 3's infrastructure and professional services associated with the maintenance of that infrastructure.

16. In September of 2011, Level 3 entered into a sole-source Indefinite Quantity, Indefinite Duration (IDIQ) contract with the Department of Homeland Security. The contract number was HSSA01-11-D-0134. Relator was the Senior Program Manager for this contract and was named on page 14 of the contract as Level 3's key person. The DHS contract was known informally within Level 3 as the "Terrawatt" contract.

17. As an IDIQ contract, work was to be awarded under specific individual task orders. Among the task orders awarded was Task Order 1 (which was labeled HSSA01-11-J-00044 by DHS) and Task Order 2 (which was labeled HSSA01-12-J-0185 by DHS).

18. At all times relevant to this Complaint, defendants also participated in a separate IDIQ contract known as "WITS 3." WITS 3 is a contractual vehicle of the General Services Administration used by many federal agencies. The Department of Defense Office of the Inspector General ("DoD OIG") contracted with Level 3 using the WITS 3 contractual vehicle.

### COUNT ONE – VIOLATIONS OF 31 U.S.C. 3729(a)(1)(A) and 3729(a)(1)(G) FALSE CLAIMS AND INVOICES ON BOTH THE WITS 3 CONTRACT AND ON THE DHS TERRAWATT CONTRACT # HSSA01-11-D-0134 (AGAINST ALL DEFENDANTS)

19. All prior paragraphs are reincorporated by reference.

20. Over time, the value of the contract with DoD OIG (through the WITS 3 contractual vehicle) had come to be worth roughly $1.5 million per month to Level 3.

21. In June of 2012, DoD OIG announced that it would be cancelling (or not renewing) its services with Level 3 under the WITS 3 contract at the start of the new fiscal year (i.e., October 1, 2012).

22. In late June of 2012, Level 3 Vice President Tim Donelson approached relator and told relator that he (Donelson) had found a way to "save" the WITS 3 contract with DoD OIG.

23. Donelson continued, telling relator that a "high-ranking" DoD OIG official had promised Donelson that if Level 3 gave the government official's son a job, the government official would be able to "re-build" the business with DoD OIG in the new fiscal year.

24. Soon thereafter, relator learned that the high-ranking DoD OIG official was named Stephen D. Wilson and that he was indeed a member of the Senior Executive Service. Relator learned that Stephen Wilson's son was named Michael Wilson.

25. Relator learned this in late June and early July when Donelson told relator that relator would have to hire Michael Wilson to perform work on the DHS Terrawatt contract that relator managed. Donelson told relator that, in return for hiring Michael Wilson, Stephen D. Wilson would "re-work" the WITS 3 contract business with DoD OIG.

26. On July 2, 2012 Donelson forwarded relator a series of emails with Michael Wilson's resume attached and wrote to relator: "Here's the candidate we talked about."

27. As relator reviewed the email chain forwarded to him by Donelson on July 2, 2012, he could see that DoD OIG employee Stephen D. Wilson had first emailed his son's resume to DoD OIG employee Kekoa LumHo on June 25, 2012 at 8:47 AM; LumHo then forwarded the resume to Level 3 manager Ron Capallia at 9:10 AM that same day, and at 10:41 AM that day Capallia forwarded the email and resume to Donelson.

28. When Capallia forwarded the email string containing the resume to Tim Donelson, he wrote the following about Michael Wilson: "Well .... His resume is a little thin but he has excellent references." Because the email string began with an email from DoD OIG Senior Executive Service member Stephen D. Wilson to DoD OIG employee Kekoa LumHo, it was very clear to relator what Capallia meant by "excellent references."

29. As Michael Wilson's resume made clear, at that point, Michael Wilson was a new college graduate with a degree in a non-technical field whose work experience consisted

primarily of being a cashier at Chick-Fil-A; he also lacked the security clearance required by the DHS contract relator managed.

30. Nevertheless, Donelson told relator to hire Michael Wilson at a salary of $65,000 per year to perform work on the DHS contract. This salary was grossly above-market for a new college graduate with a non-technical degree, no relevant work experience and who lacked a security clearance. Relator did as he was told and submitted the paperwork to hire Michael Wilson at a salary of $65,000.

31. On July 12, 2012, Level 3 Manager Rob Stout sent relator an email questioning why Michael Wilson should be paid such a high a salary. Stout stated that the correct salary range for someone like Michael Wilson would be roughly half that much, somewhere between $25,597 and $38,390.

32. As relator went about the process of hiring Michael Wilson, Stout began to send relator urgent emails about the salary for Michael Wilson. On July 17, 2012 Stout sent relator an email stating: "This [i.e., the salary range proposed] isn't going to work for a new grad like Michael with an unrelated degree and no experience."

33. Stout's July 17, 2012 email provided additional reasons why Michael Wilson could not be hired at that salary. Stout complained that Level 3 did not have any entry-level jobs appropriate for Michael Wilson on Task Order 1 of the DHS contract. Because relator was responsible for managing that contract knew that Stout's statement was true, and relator  also knew that the hiring of Michael Wilson would violate the Statement of Work for the DHS Terrawatt contract.

34. On July 19, 2012, relator sent an email to Donelson explaining why it would be difficult for him to hire Michael Wilson at that salary; relator also told Donelson that Rob Stout had told him that such a high salary would not work. The next day relator received a reply from Donelson ordering relator to "contact him [i.e., Mike Wilson] today and get the process started. I will correct Stout if needed."

35. Ultimately Stout stopped protesting and Michael Wilson was hired at a salary of $65,000 per year. Michael Wilson started work for Level 3 under relator's supervision in August, 2012.

36. Donelson told relator that Stephen D. Wilson would "re-work" or "re-build" the contract between DoD OIG and Level 3 in the new fiscal year (or words to that effect) if Level 3 hired his son, and that is exactly what happened.

37. In September of 2012 no work was performed by Level 3 on the DoD OIG contract; however, on October 2, 2012, after the start of the new fiscal year, work on the DoD OIG contract resumed. Level 3 continued to award this DoD OIG work to sub-contractor MSO Tech, and to add a percentage on top of what MSO Tech billed Level 3.

38. For example, Level 3 issued purchase order 91869 to MSO Tech in the amount of $118,000 on October 2, 2012 for work to be performed on the WITS 3 contract with DoD OIG.

39. Because Stephen D. Wilson "re-worked" the DoD OIG contract with Level 3 defendants were able to bill the government at least an additional $1,533,306.70 during the first six months of FY 2013 alone.

40. The hiring of Michael Wilson was an indirect kickback to his father, Stephen D. Wilson; alternatively, the hiring of Michael Wilson was a bribe indirectly paid to his father.

41. Level 3 paid Michael Wilson in excess of the market-supported salary for an individual with his experience, education, and skills.

42. Moreover, the contract between Level 3 and DHS stated in section 4.5: "Contractors are responsible for providing personnel with the required security clearances and accesses as DHS does not sponsor background investigations for contractor personnel."

43. Michael Wilson did not have the security clearance required by DHS because he was a new college graduate. As a result, Michael Wilson's work had to be performed by other employees until his security clearance was in place. Prior to his security clearance being completed, Michael Wilson had very little real work to perform for Level 3 but was paid his full salary.

44. In addition, DHS was billed for and paid for Michael Wilson's time during these periods when there was no work he could perform.

45. When relator asked Donelson if it was legal to hire the son of a high-ranking DoD OIG official in exchange for receiving a contract extension or renewal, Donelson told him "This is how business gets done, Stephen" or words to that effect.

46. Relator did not take the payment of kickbacks and/or bribes to a high-ranking federal employee as lightly as Donelson and relator therefore fulfilled what he saw as his duty to the United States and reported the above-information to numerous parties both inside and outside Level 3.

47. Relator reported these events to Neil Eckstein, the internal compliance officer of Level
    3. Relator also reported these events to the DHS Inspector General via written and oral
    complaints. In his written correspondence, relator specifically cited FAR 52.203-7, which
    prohibits kickbacks and bribes in government procurement.

48. FAR also provides, at FAR 52.203-13, that contractors "shall timely disclose, in writing, to
    the agency Office of the Inspector General (OIG), with a copy to the Contracting Officer,
    whenever ... the Contractor has credible evidence that a principal, employee, agent, or
    subcontractor of the Contractor has committed  ... a violation of Federal criminal law
    involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the
    United States Code."

49. Payment or acceptance of a direct or indirect bribe, kickback, or gratuity to a
    government official in return for the award of a contract or task order is unlawful
    pursuant to 18 U.S.C. § 201 *et seq.* and is punishable by up to five years in prison and a
    fine of not more than $10,000.00.  Moreover 18 U.S.C. § 371 makes it unlawful to
    conspire to defraud or commit any offense against the United States.

50. These statutory and regulatory provisions (among others) demonstrate an important
    commitment by the United States to eliminating corruption in the procurement process
    and prohibiting bribes and kickbacks to government officials.

51. Despite the fact that Neil Eckstein, the internal compliance officer at Level 3, learned
    about the kickback paid to Stephen D. Wilson, Level 3 did not fulfill the requirements of
    FAR 52.203-13 in that Level 3 did not disclose these events to the government.

52. Level 3 paid an indirect kickback or bribe to government employee Stephen D. Wilson. Wilson accepted this indirect bribe or kickback, and fulfilled his end of the bargain by re-working a lucrative contract with DoD OIG and ensuring that Level 3 (and, by extension, subcontractor MSO Tech and William Wilson) received that new work.

53. The United States does not pay claims tainted by kickbacks or bribes to government officials and claims procured through the direct or indirect payment of bribes and kickbacks are not eligible for payment by the United States.

54. Level 3 paid indirect kickbacks and bribes to Stephen D. Wilson and then submitted claims to the United States for payment that were only made possible because of the kickbacks and bribes; those claims were therefore false.

55. In addition, because the claims for work on the WITS 3 contract submitted in FY 2013 were only possible because of a bribe or kickback to a federal employee, defendants received overpayments which they failed to repay to the United States.

56. As a result, the United States has been damaged. Not only were the claims submitted to DoD OIG false (because they were tainted by a kickback) but many of the claims submitted to DHS for the work of Michael Wilson were false because he lacked the required security clearance; the United States was therefore damaged in an amount not less than $5,000,000.00.

### COUNT TWO – VIOLATIONS OF 31 U.S.C. § 3729(a)(1)(A)
### SUBMISSION OF FALSE CLAIMS FOR MONTHLY RECURRING CHARGES FOR DATA CIRCUITS ON DHS CONTRACT # HSSA01-11-D-0134
### Task Order # 1 (HSSA01-11-J-00044)
### (AGAINST LEVEL 3)

57. All prior paragraphs are reincorporated by reference.

58. As part of Level 3's contractual responsibilities to the United States on DHS contract HSSA01-11-D-0134, Level 3 agreed to provide two data circuits of 200Mbps each going from a Level 3 data facility located in Herndon, Virginia, to a data facility in Clarksville, Virginia operated on behalf of DHS by Hewlett Packard.

59. Level 3 began billing the government for these circuits at the time Task Order 1 was awarded, and the first invoice went out in November 2011 for the month of October 2011. The agreed-upon price was a monthly recurring charge of $24,000 per month for each of the two circuits – in other words, a total of $48,000 per month.

60. However, the circuits—which were eventually leased from a company known as Mid-Atlantic Broadband—were not put into service until late September or early October of 2012; the Level 3 defendants had therefore billed the United States 11 equal monthly installments for circuits that were not in fact transmitting any data.

61. Relator knows this because he worked with other Level 3 employees to prepare a document labeled "CDRL#038 – Burn In Test Report." This document is contractually-required proof that the circuits are actually functioning and transmitting data.

62. Relator submitted this contractually required document to DHS via an email to DHS employee Debra Mims on October 6, 2012.

63. Level 3 therefore submitted at least 11 individual false claims to the government. The claims were false because the defendants charged the government for MRCs on data circuits that were not in fact transmitting data.

64. In total, the United States paid $528,000.00 in MRCs for these two data circuits which the United States should not have paid.

65. As a result, the United States has been damaged in an amount not less than $528,000.00; additionally, because the costs for these two data circuits was combined into an overall monthly fee, the entire monthly claim for payment made by Level 3 to the United States was false.

### COUNT THREE – VIOLATIONS OF 31 U.S.C. § 3729(a)(1)(A) SUBMISSION OF FALSE CLAIMS FOR MONTHLY RECURRING CHARGES FOR DATA CIRCUITS ON DHS CONTRACT # HSSA01-11-D-0134 Task Order # 1 (HSSA01-11-J-00044) and Task Order # 2 (HSSA01-12-J-0185) (AGAINST LEVEL 3)

66. All prior paragraphs are reincorporated by reference.

67. As part of Level 3's Monthly Recurring Charges to the United States, Level 3 agreed to provide DHS a different data circuit (known in the industry as a "10GB wavelength circuit") into Level 3's Herndon Virginia data facility.

68. Level 3 began billing for this circuit in July 2012 in support of Task Order 1 (HSSA01-11-J-00044) on DHS Contract HSSA01-11-D-0134.  At that time, the monthly recurring charge was $85,737.50; Level 3 made a total of three claims for monthly recurring charges in July, August, and September of 2012 on Task Order 1; the cost to the United States for these three months was $257,212.

69. When Task Order 1 expired at the end of FY 2012, billing for the 10GB circuit became part of Task Order 2 for FY 2013.

70. For FY 2013, when billing for this 10GB circuit transitioned to becoming part of Task Order 2, the price of the circuit decreased to $81,450.63 from $85,737.50.

71. Claims were made to the United States for monthly recurring charges for this 10GB circuit for the first eight months of FY 2013 – that is, every month from October of 2012 through May of 2013; those claims were for $81,450.63 every month.

72. However, relator has first-hand knowledge that this 10GB wavelength circuit was not transmitting any data in May of 2013 when he resigned his employment with Level 3.

73. Relator has first-hand knowledge that this 10GB wavelength was still not transmitting data in July of 2013, because that month Scott Herman, the Deputy Program Manager hired by relator during his employment with Level 3, called relator requesting the Circuit ID for the 10GB circuit.

74. Scott Herman called relator to request the Circuit ID, because without the Circuit ID, the circuit could not be "provisioned;" in other words, it could not begin transmitting data.

75. Even though the 10GB circuit was not transmitting any data at all from July of 2012 through July of 2013, Level 3 knowingly submitted (or caused to be submitted) false claims to the United States for monthly recurring data charges on those circuits for each one of those months in the total amount of $1,071,718.80.

76. As a result, the United States has been damaged in an amount not less than $1,071,718.80; additionally, because the costs for this data circuit was combined into an overall monthly fee, the entire monthly claim for payment made by Level 3 to the United States was false.

**COUNT FOUR – VIOLATIONS OF 13 U.S.C. § 3729(a)(1)(A) and § 3729(a)(1)(C)**
**SUBMISSION OF FALSE CERTIFICATIONS OF COMPLIANCE WITH WOMAN-OWNED**
**BUSINESS REQUIREMENTS AND CONSPIRACY TO SUBMIT FALSE CLAIMS TO THE**
**UNITED STATES ON DHS CONTRACT # HSSA01-11-D-0134**
**Task Order # 1 (HSSA01-11-J-00044) and Task Order # 2 (HSSA01-12-J-0185)**
**(AGAINST ALL DEFENDANTS)**

77. All prior paragraphs are reincorporated herein by reference.

78. In September of 2011, when Level 3 entered into the contract with DHS, numerous provisions of the United States Code and the Federal Acquisition Regulations were incorporated by reference.

79. Those provisions included a mandatory set-aside that required Level 3 to award a certain amount of work to woman-owned small business concerns.

80. FAR 52.204-8 requires certain annual representations and certifications not only by Level 3, as the prime contractor, but also by its subcontractors, PVS and MSO Tech.

81. Rather than award work to an actual woman-owned, small business concern, Level 3 entered into a conspiracy with defendants Robin Wilson, William Wilson, and the two corporate entities under their control, PVS and MSO Tech.

82. Robin Wilson was owner of the majority of the stock in PVS; she was also the wife of William Wilson, the owner of MSO Tech.

83. PVS was at all times relevant to this Complaint, a sham corporation in that PVS had no employees, payroll, or assets; despite being a sham company PVS was awarded millions of dollars in sub-contract work by Level 3.

84. The work of all sub-contracts awarded to PVS was performed by employees of MSO Tech; the billing and back-office functions of PVS were performed by MSO Tech employees also.

85. Relator has personal, first-hand knowledge of this because he was the Level 3 employee responsible for receiving invoices to Level 3 for work supposedly performed by PVS but in reality performed by MSO Tech.

86. As one example, on October 23, 2012, MSO Tech employee Terri Milton sent relator an email with four invoices for services rendered; Terri Milton sent these invoices via her MSO Tech email address.

87. The total amount of the four invoices was $1,094,716. As Milton explains in her email to relator, "These invoices need to be paid to PVS."

88. Milton further instructs relator in that email that two of the four invoices "complete the previous PO [i.e., purchase order] for Clarksville ... [and the other two invoices] are from the new PO."

89. When Milton referred to "the new purchase order" she meant purchase orders 71444 and 71445. Donelson had ordered relator to issue these two purchase orders although no supporting data was ever provided to relator; nor did Donelson put anything in writing for these two purchase orders.

90. The four invoices submitted by Milton to relator were, to be sure, on PVS letterhead; however, PVS letterhead was more or less the only link between PVS and this work, because PVS had no employees, payroll or assets.

91. In total, more than $6,472,304.00 in sub-contract work was "awarded" to PVS as a woman-owned, disadvantaged small business. None of the work was performed by PVS, however, and all such work was performed by employees of MSO Tech, which was not a woman-owned business.

92. For example, when PVS had to have an employee obtain a security clearance for certain work, it had an MSO employee named Dean Carter cleared by the government because PVS didn't have any employees.

93. PVS was a sham corporation and all work awarded to PVS was actually performed by employees of MSO Tech and Level 3 (through Capallia and Donelson) knew this all along. Despite this knowledge, Level 3 made affirmative representations that all set-aside requirements were being met.

94. Level 3 made certified to the United States four times per year that it was meeting its set-aside requirements; those representations and certifications were false and Level 3 knew they were false.

95. Furthermore, Level 3 (again, via Capallia and Donelson) entered into a conspiracy with William Wilson and Robin Wilson (and the companies under their control) to submit false or fraudulent claims to the United States; without the assistance and cooperation of Robin Wilson and William Wilson these false claims would not have been possible.

96. As a result, the United States has been damaged in an amount of not less than $6,472,304.00.

## COUNT FIVE – VIOLATIONS OF 31 U.S.C. § 3729(a)(1)(A)
### SUBMITTING FALSE CLAIMS FOR CONSTRUCTION OF FIBER OPTIC CABLE
### DHS CONTRACT # HSSA01-11-D-0134
### TASK ORDER #1 (HSSA01-11-J-00044)
### (AGAINST ALL DEFENDANTS)

97. All prior paragraphs are reincorporated herein by reference.

98. Defendants all conspired together to submit false and fraudulent claims to the United States in the amount of $3,623,252 for construction work associated with laying more than 30 miles of fiber-optic cable; the $3.6 million was included in Level 3's total charges to DHS under Task Order 1 (HSSA01-11-J-00044).

99. Level 3 had contracted with the United States as part of the DHS contract to provide data service from the Level 3 data center in Herndon, Virginia, to the DHS data center in Clarksville, Virginia.

100.    This data service could be provided by Level 3 in one of two ways. Level 3 could either extend its own physical infrastructure into the Clarksville data center (which would cost millions of dollars in construction costs and would also entail costs for having equipment in the facility) or it could lease circuits on the network of another internet service provider (which would not require any initial construction costs or equipment costs).

101.    Level 3 (through Donelson) decided to extend its own physical infrastructure to the Clarksville data center. The Level 3 data center in Herndon, Virginia was already connected to a Level 3 data center in Henderson, North Carolina, about 30 miles from Clarksville. Level 3 therefore began the planning and construction of a 30-plus mile fiber-optic cable route from the Henderson data center to the Clarksville data center.

102.    However, Level 3 knew at the time it began to make this plan that Level 3 would not have access to the Clarksville data center and would not be able to extend its physical infrastructure into the Clarksville data center in the foreseeable future.

103.    Relator has first-hand knowledge that Level 3 knew it would not have access to the Clarksville data center because, prior to the start of construction, relator and Donelson had approached Hewlett Packard (which operates the Clarksville data center for DHS) to negotiate a building access agreement and HP/DHS had declined the offer.

104.    A building access agreement is fundamental to Tier-1 internet service providers like Level 3; in basic terms, a building access agreement is a written contract in which an internet service provider agrees to finance and build the physical infrastructure necessary to reach a particular facility, and the owner of the facility makes certain representations in return.

105.    A building access agreement contains various terms and conditions vital to internet service providers like Level 3. A number of very specific technical requirements must be met by the facility, and without a written guarantee of those specific technical requirements internet service providers do not finance the expensive construction work to expand their network.

106.    Among other requirements, the data facility must have space, wiring and electricity to power the necessary equipment; there are also very specific temperature requirements to ensure the equipment will not overheat.

107.    A Tier-1 internet provider will want assurances that it will be able to recoup the money spent to construct a fiber-optic connection to a data center. Therefore, building access agreements usually or always contain a written guarantee that the owner of the data center will use that Tier-1 provider for a specific term of years.

108.    When Donelson and relator approached HP/DHS to negotiate the terms of the building access agreement that would guarantee these technical and business requirements they were told clearly and unequivocally that the facility did not need, could not accommodate, and did not want an additional internet service provider to have physical access to the data center.

109.     HP/DHS knew that Level 3 could simply rent circuits on the network of another reliable company that already had physical access to the data center, such as Mid-Atlantic Broadband, to meet the requirements of the contract.  Level 3 also knew that it could simply rent circuits from Mid-Atlantic Broadband, and Level 3 also knew that Mid-Atlantic Broadband had access to the Clarksville data center.

110.     HP/DHS conveyed its choice to Level 3 in several ways, including at a meeting in Arlington Virginia between Level 3 employees (including relator) and DHS employees.

111.     Despite being told that HP/DHS did not need or want another internet service provider to be physically present in the Clarksville data center, Level 3 included $3.6 million for construction costs in the total price of Task Order 1.

112.     Level 3 concealed the costs associated with this fiber-optic extension from the United States, but Level 3's internal processes demonstrate clearly that Level 3 knew what it was doing.

113.     Level 3 would be spending several million dollars to build this fiber-optic extension before being able to recoup this money from the government on Task Order 1, and therefore multiple levels of internal review and approval were required inside Level 3.

114.     Seanna Gilliland, who works in the finance department of Level 3's federal group, had to approve the capital expense, as did Vice-President and General Manager Edward Morche.  Before Gilliland and Morche would approve the expense, both had to be convinced that Level 3 would recoup its money within a certain period of time.

115.     On December 7, 2011, Gilliland gave a powerpoint presentation (which relator

attended). Slide 5 of her presentation clearly states "incremental capital" would be

required for the construction, and also states "payback in 11 months."

116.     That same slide also states that "construction into DHS in Clarksville MD [sic]."

117.     Although Level 3 knew that HP/DHS would not grant it access to the data center

Level 3 (through Donelson) had already orally told PVS/MSO (through William Wilson) to

begin the preliminary engineering services for the 30 mile fiber-optic route.

118.     Donelson told William Wilson to begin preliminary work on the fiber-optic

extension before Task Order 1 had been awarded to Level 3 and even before the

expenditure had been approved by the Level 3 finance department.

119.     Because Level 3 would not have access to the Clarksville data center, Level 3 and

PVS/MSO terminated the 30-mile fiber-optic extension on Burlington Drive in Clarksville

outside the data center.

120.     In addition Donelson and/or Capallia and other employees of Level 3 acting at

their direction made false representations to the United States by concealing the fact

that the price of Task Order 1 (which was originally a total of $7.9 million) included

$3.216 million for construction work the government didn't want and didn't know it was

paying for.

121.     Level 3 included $3.216 million for construction of the 30-mile fiber optic

extension into the original total of $7.9 million for the entire fiscal year; therefore when

the total payment for Task Order 1 was divided into twelve equal installments of

$661,365.30 (at the request of DHS) the United States paid part of the false claim each month.

122.     At some point near the end of the fiscal year, a contract modification was issued (Mod # P000003) that extended the task order until October 2012 and which also increased the total amount of the construction costs to $3.6 million (up from the original price of $3.216 million). When this modification was issued, it increased the monthly expense of the last three monthly invoices from $661,000 to $785,000 per month.

123.     The total amount of $7,936,383.64 originally quoted to the United States for the work of Task Order 1 was false because it included more than $3.216 million for construction of a fiber-optic extension when DHS had told Level 3 that it did not want this extension and would not pay for it.

124.     After Modification P00003, the total price of Task Order 1 increased to $8.2 million, and that total price of Task Order 1 was also false for the same reason, as was each monthly charge.

125.     The United States (through DHS) would not have paid these 12 monthly installments had it realized it was paying for the fiber-optic extension in addition to the other work of Task Order 1.

126.     Upon information and belief, sometime in FY 2014, Level 3 may have gained access to the Clarksville data center for its fiber-optic cable. This later success, however, does not change the fact that false representations were made when Task Order 1 was awarded and does not change the fact that false representations were made about the

costs the United States was paying on Task Order 1; nor does it change the fact that 12

false invoices were submitted to DHS.

127.     As a result, the United States has been damaged in an amount in excess of $8.2

million.

**COUNT SIX – VIOLATIONS OF 31 U.S.C. § 3729(a)(1)(B) and (G)**
**DHS CONTRACT # HSSA01-11-D-0134**
**Task Order # 1 (HSSA01-11-J-00044) and Task Order # 2 (HSSA01-12-J-0185)**
**(AGAINST LEVEL 3)**

128.     All prior paragraphs are reincorporated herein by reference.

129.     The professional services component of the DHS contract was firm fixed price.

Level 3 was however required to provide hourly rates to the Government as part of its

pricing justification.

130.     The information provided by Level 3 was false and inflated the salaries of all

employees that would perform work.  As a result Level 3 made a number of false

representations to the United States and received a series of overpayments.

131.     For example, relator has first-hand knowledge that the cost for the Program

Manager's position (this was the role relator performed) for Task Order 2 was

represented to the government to be $205,000.00 when in reality the Program

Manager's salary was $142,800.00 and his benefits package was no more than an

additional $35,000 per year at most; in addition to overstating his salary, Level 3 also

added on an additional percentage which was supposed to constitute its profit.

132.     Level 3 also stated incorrectly the number of employees of various types needed

to perform the work of the DHS contract. As a result, more expensive technical

employees often performed work unrelated to their technical fields of specialization

when that work could have been performed by cheaper, unskilled employees. Also, as a result of turnover, Level 3 would routinely staff the DHS contract with four or five less Full Time Employees than were being billed to the government.

133.    The creation and use of these false records and statements resulted, overall, in a higher FFP than necessary to the United States Government; Level 3 made and used false records or statements to retain these overpayments.

134.    Among the FAR clauses incorporated by reference into the DHS contract was FAR 52.215-10—Price Reduction for Defective Cost or Pricing Data

135.    This clause gives the government the right to reduce the price payable to the contractor if the pricing data provided to the government is defective or faulty. Most importantly, 52.215-10(d) provides that if the government has already paid money as a result of defective cost or pricing data, such payments are "overpayments."

136.    Level 3 took affirmative steps to obtain these overpayments and then took steps to avoid repaying these overpayments.

137.    Even if Level 3 did not intentionally start out with the intent to create and submit false claims or records in support of knowingly false claims, Level 3 did retain the overpayments that resulted from unintentional understaffing of the DHS contract and/or misrepresenting the salaries and benefits paid to its employees working on the contract and/or placing highly-compensated technical employees in non-technical roles.

138.    As a result, the United States has been damaged in an amount to be determined at trial.

### COUNT SEVEN – VIOLATION OF THE FEDERAL FALSE CLAIMS ACT 31 U.S.C. § 3729(a)(1)(A) AND (G)

**(AGAINST ALL DEFENDANTS)**

139.    All prior paragraphs are reincorporated herein by reference.

140.    The Anti-Kickback Act of 1986 (41 U.S.C. §§ 51-58)("AKA") was passed to deter

subcontractors from making payments and contractors from accepting payments for the

purpose of improperly obtaining or receiving favorable treatment in connection with a

prime contract or a subcontract.

141.    AKA also requires contractors like Level 3 to have procedures in place to prevent

kickbacks and detect in its operations and direct business relationships.

142.    As alleged in this Complaint, Level 3 officer Tim Donelson accepted kickbacks

and/or bribes from William and Robin Wilson, who owned and operated MSO Tech and

PVS; these kickbacks and bribes were illegal consideration for the continuing award of

millions of dollars in work to MSO and PVS.

143.    Among other bribes and kickbacks, William Wilson provided expensive hunting

trips to Donelson and provided Donelson will an all-expense paid trip to the Daytona

500 in 2012. William Wilson also purchased a new pickup truck for Donelson in

exchange for Donelson's granting the companies under Wilson's control sub-contracts.

144.    In return, Donelson ensured that tens of millions of dollars in subcontracts were

directed to William and Robin Wilson and the companies under their control. Donelson

also pressured other employees of Level 3 (including but not limited to relator) to award

subcontracts to the Wilsons and to PVS and MSO.

145.     Donelson awarded the vast majority of the contracts to the Wilsons, PVS and

MSO with no competition; when there was fair competition, the Wilsons, PVS and MSO

still received the subcontracts regardless of whether they had the lowest bid.

146.     For example, in February of 2012, the Wilsons and/or companies under their

control performed a site survey on the Social Security Administration offices in

Baltimore. The Wilsons and/or their companies were awarded this work and were paid

$168,818 for this work, although they were not the lowest bidder.

147.     The United States does not pay claims tainted by kickbacks, and claims for work

obtained by the payment or receipt of kickbacks are ineligible for payment. When

MSO/PVS submitted claims for payment for work performed as a result of a kickback

those claims were false; those claims were also false when Level 3 billed them to the

United States.

148.     The AKA also provides that the price or cost of the kickback is presumed to have

been borne by the United States.

149.     Donelson accepted kickbacks and/or gratuities and the cost of those kickbacks or

gratuities is presumed to have been borne by the government.

150.     As a result, the United States has been damaged in an amount to be determined

at trial.

### COUNT EIGHT – VIOLATIONS OF 31 U.S.C. § 3729(a)(1)(A),(B) and (G) SUBMITTING FALSE CLAIMS TO THE UNITED STATES; CREATING AND USING FALSE RECORDS AND STATEMENTS, AND INTENTIONALLY RECEIVING AND RETAINING OVERPAYMENTS ON THE WITS 3 CONTRACT WITH DoD OIG (AGAINST ALL DEFENDANTS)

151.     All of the preceding paragraphs are realleged and reincorporated by reference.

152.     At all times relevant to this Complaint, the federal division of Level 3 used an Oracle-based procurement system known as "iProcurement" to track purchase orders from Level 3 to its vendors and subcontractors.

153.     Only certain Level 3 employees and/or officers were authorized to enter purchase orders in iProcurement; when Level 3 employees entered such purchase orders they normally entered identifying information (such as the relevant project number) so that an auditor could later understand the reason for the expenditure.

154.     Entering the project number in the iProcurement system is just one way to add identifying information to the purchase order.  If a Level 3 employee didn't enter a project number for the purchase order he or she would need to enter additional or supplemental information such as the General Ledger account to which the purchase order should be recorded.

155.     In those instances when a General Ledger account was used instead of a project number, the supplemental information in iProcurement may or would include things like the name of the subcontractor or vendor, the name of Level 3 employee responsible for managing the work of the subcontractor and/or a short description of the work or equipment purchased.  This supplemental information would be included in lieu of a project number so that an auditor could have more information at his or her disposal when reviewing purchase orders.

156.     Among the Level 3 employees authorized to enter purchase orders in the iProcurement system was Ron Capallia.

157.     On April 3, 2012, Capallia entered a number of purchase orders into

iProcurement for the DoD OIG contract, each with a General Ledger Account Code

instead of a project number. That day, Capallia entered 11 purchase orders for

$150,000 each to General Ledger Account Code 100.0000.000.000.31941.0000 for

"Project Help Desk Tier 1" or sometimes "Project Help Desk Tier 2."

158.     Then, on May 3, 2012, Capallia entered 50 purchase orders for $190,000.00 each

(for a total of $9.5 million) in the iProcurement system for the DoD OIG contract; instead

of including a project number Capallia entered General Ledger Account Code

(100.0000.000.000.31941.0000) in the space allotted for the project number for each

purchase order.

159.     For each of the 61 purchase orders described above, Capallia failed to mention

the name of the subcontractor or vendor to whom the purchase orders were entered;

Capallia also did not record the last name of the Level 3 employee responsible for

managing the subcontractor or vendor performing the work. Instead, Capallia listed

nothing more than a position description such as "Audio Visual/VTC Support" or "Senior

Communications Analyst."

160.     Capallia took these steps (i.e., entering a General Ledger Account number

instead of a project number, omitting the name of the subcontractor or vendor, and

omitting the name of the Level 3 employee responsible for managing the work for the

subcontractor or vendor) in the iProcurement system in order to make it impossible (or

at least, very difficult) to audit the expenditure of this $11.1 million and therefore

impossible to determine if the work was ever actually performed or completed.

161.     The next day (i.e., on May 4, 2012) Capallia entered 12 more purchase orders for $190,000.00 each in exactly the same way, for a total of $2.28 million. Each of those 12 purchase orders suffered from the same flaws as the first 61 described above.

162.     Besides the 73 purchase orders described above, Capallia entered dozens of additional false purchase orders for on the WITS 3 contract with DoD OIG between April of 2012 and May of 2013; those purchase orders contain nothing more than a General Ledger number and a position description, plus an indication that the entry is for "Network Expense."

163.     Upon information and belief, relator is the reason the false and fraudulent purchase orders stopped in May of 2013. Prior to the end of his employment (and as alleged above) relator took steps to stop the violations alleged by reporting the fraud to various individuals both within and outside Level 3. On May 10, 2013, Donelson called relator's cell phone and left a voicemail asking relator to call him about "some conversations you have had with people at Level 3." After early May, 2013, the false and fraudulent purchase orders described herein stopped.

164.     There were no subcontractors or vendors actually performing any or most of the work billed on these non-descript purchase orders entered by Capallia, and that is the reason Capallia omitted the name of a Level 3 employee responsible for managing the subcontractor or vendor.

165.     At the same time, Capallia continued to enter purchase orders on contracts other than the WITS 3 contract with DoD OIG in the normal manner and with sufficient

detail to enable later readers to determine what was purchased, who performed the

work, and which Level 3 employee managed the work.

166.      In total, more than $21 million in purchase orders was entered in iProcurement

by Capallia for work that was not done and for subcontractors who did not exist.

167.      Those purchase orders were therefore false; despite their falsity, Level 3 passed

along the cost of these purchase orders to the United States along with a mark-up.

168.      In addition to submitting false claims to the United States for work that was not

performed and for subcontractors that did not exist, Capallia's entries into iProcurement

were false records or statements used to support a false claim.

169.      As a result, the United States has been damaged in an amount of not less than

$21 million dollars.

WHEREFORE, Relator respectfully requests that the Court enter judgment against

DEFENDANTS LEVEL 3 COMMUNICATIONS, INC., PVS INC., MSO TECH, INC., WILLIAM S.

WILSON AND ROBIN P. WILSON, JOINTLY AND SEVERALLY, as follows:  (a) That the U.S. be

awarded single damages in an amount to be determined at trial but not less than

$50,000,000.00 (fifty million dollars) for the fraud and false claims alleged herein, and that

those damages be trebled pursuant to 31 U.S.C. § 3729; (b) that a civil penalty of $11,000 be

imposed for each and every false claim presented to the U.S. and/or caused to be presented

to the U.S.; and (c) that pre-and post-judgment interest be awarded, along with relator's

reasonable attorneys' fees, costs, and expenses incurred in prosecuting this case; and (d)

that the relator be awarded the maximum percentage of the government's recovery

allowed pursuant the False Claims Act; additionally, relator requests any alternative or supplemental relief the court may deem appropriate.

TRIAL BY JURY IS DEMANDED.

Date: 6/16/2014

For Relator Stephen Bishop:

Zachary A. Kitts
Virginia Bar # 47052
Justin Gilbert
Virginia Bar # 74083
Counsel for Relator
K&G Law Group, PLLC
3554 Chain Bridge Road, Suite 400
Fairfax, Virginia 22030
Phone: 703-649-5500
Fax:  703-649-6363
Email:  zkitts@kglawpllc.com

## CERTIFICATE OF SERVICE

I hereby certify that on June 16, 2014 I transmitted a copy of Relator's First Amended Complaint via email to the following:

Kevin J. Mikolashek
Assistant United States Attorney
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, Virginia 22314
Kevin.Mikolashek@usdoj.gov

Zachary A. Kitts
Virginia Bar # 47052
Counsel for Relator
K&G Law Group, PLLC
3554 Chain Bridge Road, Suite 400
Fairfax, Virginia 22030
Phone: 703-649-5500
Fax:  703-649-6363
Email:  zkitts@kglawpllc.com